*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* FOX, Minors.

UNPUBLISHED
April 07, 2025
3:15 PM

No. 370601
Lake Circuit Court
Family Division
LC No. 22-001922-NA

Before: GADOLA, C.J., and WALLACE and ACKERMAN, JJ.

PER CURIAM.

Respondent appeals as of right the trial court's order terminating her parental rights to her minor children, MF and DF, under MCL 712A.19b(3)(c)(*i*) and (j).[1] We affirm.

## I. FACTS

Respondent is the biological mother of MF and DF. Child Protective Services (CPS) initially became involved with the family on August 2, 2022, after a report of domestic violence between respondent and the children's father. At that time, MF was approximately one and a half years old, and DF was four months old. On September 30, 2022, a CPS worker visited respondent and offered to provide services to the family, including Community Mental Health (CMH) services, a psychological evaluation, domestic violence services, parenting education, and the Families First program. Respondent declined the services.

A CPS worker conducted another home visit on October 13, 2022. The CPS worker observed that MF's front two teeth were rotted, and also saw MF eating dog food. Respondent was unconcerned about MF eating dog food and stated that MF's teeth had always been like that. Respondent reported that the police had been called multiple times due to ongoing domestic

---

[1] The parental rights of the children's biological father also were terminated; he is not a party to this appeal.

violence between her and the children's father. The CPS worker referred respondent to Families First; respondent attended two meetings and thereafter canceled her participation in the service.

On November 3, 2022, Dr. Kovas, with Spectrum Health, reported concern to a CPS worker that respondent was not providing proper food to DF. Dr. Kovas had instructed respondent about the proper food for DF, and had discussed MF's teeth with respondent and provided contact information for a pediatric specialist dentist, but respondent had failed to attend recent appointments for MF. Dr. Kovas was concerned about respondent's ability to parent because respondent interrupted Dr. Kovas and did not appear to understand Dr. Kovas' instructions.

On November 15, 2022, a CPS worker again visited respondent's home. The worker found that MF had a scratch on her right cheek and was wearing damp, soiled clothes. Petitioner referred the children for Early On services and CMH services, but respondent did not make an appointment for the services. On November 23, 2022, MF fell off an observation table while in the doctor's office because respondent was not paying attention to her. Respondent could not explain an earlier bruise on MF's chest, and was hostile to the medical providers.

On December 2, 2022, a Families First worker reported to CPS that respondent would not engage with the Families First worker even after multiple strategies were attempted. On December 8, 2022, respondent texted to the CPS worker a photograph of the children's father holding a knife and reported that she felt unsafe. On December 14, 2022, a CPS worker again visited the home. Respondent had cancelled MF's dental appointment because she misunderstood the operating hours of Dial-A-Ride transportation service; the CPS worker assisted her with obtaining a ride through Dial-A-Ride. At the dentist's office, respondent did not supervise MF and was instead using her phone while MF ran around the office and jumped on furniture. After the appointment, respondent left without checking out or scheduling an appointment to address MF's remaining dental problems.

Respondent thereafter participated in a psychological evaluation that revealed that she has a mild intellectual disability; the report concluded that respondent did not understand child development and did not have the skills to provide support and guidance for the children.

On December 21, 2022, petitioner, the Department of Health and Human Services (DHHS), filed a petition to remove the children from respondent's care due to ongoing concerns about respondent's lack of cognitive ability to parent, improper supervision of the children, lack of participation in services, her disregard of the children's medical care, and ongoing domestic violence. At the preliminary hearing, the foster care worker reported that respondent had attended the Families First services, but had made no progress due to lack of participation while attending. The foster care worker reported that in addition to Families First services and a psychological evaluation, petitioner also had offered respondent services through CMH and Early On, a maternal infant health program, and bus tokens for transportation. The parenting classes were tailored to respondent's needs with one-on-one instruction.

The trial court assumed jurisdiction of the children under MCL 712A.2(b)(1) finding that respondent had failed to provide the care necessary for the children's health and that it was unsafe for the children to remain in the home. The children were removed from respondent's care and placed together in a foster home. The initial goal was reunification of respondent and the children.

Respondent pleaded no contest to the allegations of the petition. Foster care worker Ashley Aisthorpe testified that three medical providers had reported that respondent did not listen to the medical providers nor follow their instructions, and that there were concerns about the long-term health impact of MF's rotted teeth. She testified that Families First services had been attempted twice, and respondent had been offered parental education, Early On services, CMH services, a psychological evaluation, and case management.

At a subsequent dispositional review hearing, foster care worker Rosemary Correll testified that when the children entered foster care, they both had ear infections and bronchitis. The children also were developmentally delayed; at eight months, DF could not sit unassisted and MF was delayed in walking and in speech. Respondent was attending weekly supervised parenting time with the children, but had difficulty caring for both children. A supervisor saw MF run out into a parking lot because respondent was not holding her hand, and the employee had to pull MF back to prevent her from being hit by a car. Another time, respondent brought crackers and chunks of cheese to her parenting time as a snack for the children, which a supervisor told respondent was a choking hazard. MF then choked on a piece of cheese; when the employee told respondent that MF was choking, respondent said, "I'm not blind. I can see that she's choking." MF began to turn blue, and the employee had to intervene to get the cheese out of MF's airway. During the same parenting time, DF choked on a cracker.

Correll testified that respondent functioned at an "extremely low to borderline range" and read at a second-grade level, and that based on the psychological evaluation, respondent did not have the needed skills to provide support and guidance for the children. Respondent was receiving one of the highest levels of services available, and Correll testified that no additional applicable services were available. Respondent was participating in Families Supportive Services, which offered one-on-one, hands-on parenting education, and the service providers had slowed the pace of the program to allow respondent additional time to learn the information. Respondent was attending CMH and receiving Michigan Adult Level III case management, which provided respondent with therapy, assistance in scheduling medical appointments, and any other daily basic needs. Although respondent attended CMH services regularly and was doing well, she behaved poorly at several of the children's medical appointments, where she arrived early for the appointments and became agitated and hostile toward the foster parents who had not yet arrived. Because of respondent's intellectual disability, petitioner provided respondent additional assistance with housing and case management, and petitioner also referred respondent to Michigan Rehabilitation Services, which works with developmentally disabled adults. Respondent was provided online parenting educational classes so that she could obtain the information by watching videos.

At a subsequent dispositional review hearing, foster care worker Rebecca Vallette testified that respondent had a history of cognitive and intellectual disability, and an extremely low ability to pay attention, concentrate, and exert mental control. Respondent did not understand child development or techniques that would assist her children. She continued to receive services through Family Supportive Services; a Family Supportive Services worker met with respondent prior to her parenting time for her training, rather than doing the standard hands-on training during her parenting time. The providers working with respondent were aware of her cognitive disability and had altered their programming to better work with her. Nonetheless, respondent had refused to participate in some services, and had made minimal progress towards her goals. Vallette

testified that a home study was performed at the home of respondent's mother where respondent was living. Respondent's father, who lived on the property, was a registered sex offender. Petitioner requested that the permanency goal be changed to adoption.

Petitioner filed a supplemental petition to terminate respondent's parental rights. At the conclusion of the termination hearing, the trial court found that clear and convincing evidence demonstrated that termination of respondent's parental rights was warranted under MCL 712A.19b(3)(c)(*i*) and (j). Although respondent had participated in several services, respondent had not demonstrated the ability to provide the children with safety, supervision, medical care, and guidance, and had failed to demonstrate consistency and emotional control. The trial court also found that it was in the children's best interests to terminate respondent's parental rights. The children were in a stable foster home that was able to meet their needs, and respondent could not meet the children's needs and was unlikely to be able to do so in the future. The trial court terminated respondent's parental rights to the children. Respondent now appeals.

## II. DISCUSSION

## A. REASONABLE EFFORTS

Respondent contends that the trial court clearly erred by finding that petitioner made reasonable efforts to reunify her with the children because petitioner failed to accommodate her intellectual disability. We review for clear error the trial court's decision that the agency made reasonable efforts toward reunification. *In re Atchley*, 341 Mich App 332, 338; 990 NW2d 685 (2022). We review de novo the trial court's interpretation and application of a statute. *In re Sanders*, 495 Mich 394, 404; 852 NW2d 524 (2014).

In general, the DHHS must make reasonable efforts to reunify families before seeking to terminate parental rights. MCL 712A.19a(2); *In re Hicks*, 500 Mich 79, 85; 893 NW2d 637 (2017). Absent aggravating circumstances, termination of parental rights is not appropriate unless reasonable efforts at reunification have been made. *In re MJC*, __ Mich App __, __; __ NW3d __ (2023) (Docket No. 365616); slip op at 3. As part of the reasonable efforts, the DHHS "must create a service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *In re Hicks*, 500 Mich at 85-86. The respondent has the responsibility to participate in and benefit from the offered services. *In re TK*, 306 Mich App 698, 711; 859 NW2d 208 (2014).

Reunification efforts are not reasonable, however, unless the petitioner modifies the services offered to accommodate a disabled parent's disability. *In re Hicks*, 500 Mich at 90. The Americans with Disabilities Act (ADA), 42 USC 12101 *et seq.*, requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 USC 12132; *In re Hicks*, 500 Mich at 86. The DHHS therefore must make reasonable accommodations in the services offered to a parent with a disability, including an intellectual or cognitive disability, unless doing so would fundamentally modify a provided service. *In re Sanborn*, 337 Mich App 252, 263; 976 NW2d 44 (2021). To demonstrate that the DHHS failed to make reasonable efforts to reunify the family, the respondent must establish that he or she would have fared better had other services been offered. *Id*. at 264.

In this case, petitioner made reasonable efforts to reunify respondent and her children and modified the offered services to accommodate respondent's cognitive disability. A service plan was created for respondent, which included mental health counseling, CMH services, one-on-one parenting education, supervised parenting time, a psychological evaluation, infant mental health services, Early On services, transportation and housing assistance, case management, and family team meetings. Petitioner modified its services to include both oral and written instructions, frequently repeated instructions and simplified instructions, assisted respondent with reading documents and with using a calendar to track appointments, provided a referral to Michigan Rehabilitation Services, provided written parenting homework as well as verbal instructions, provided access to online parenting videos, and ensured that service providers tailored services to respondent's abilities.

Despite the additional assistance with services, respondent failed to participate consistently in the provided services. When respondent attended the offered services, she would ignore the service providers or refuse to participate and failed to follow through with certain referrals. Respondent failed to show substantial improvement and continued to struggle with anger management, proper sanitation, and the safety and supervision of her children. Despite the numerous services and accommodations provided by petitioner to respondent, respondent was unable to demonstrate sufficient ability or understanding to safely care for the children, and failed to demonstrate that she would have been able to acquire sufficient ability to care for the children had different or additional services or accommodations been offered. See *Sanborn*, 337 Mich App at 266. Based on the record, we conclude that the trial court did not clearly err by finding that petitioner made reasonable efforts to reunify respondent with the children.

## B. BEST INTERESTS

Respondent also contends that the trial court erred by determining that termination was in the children's best interests because it did not consider the children individually nor consider the possibility of a guardianship. We disagree.

Once the trial court finds that a statutory basis for terminating a parent's rights has been established, the trial court must terminate the parent's rights if a preponderance of the evidence demonstrates that termination is in the child's best interests. MCL 712A.19b(5); *In re Medina*, 317 Mich App 219, 236-237; 894 NW2d 653 (2016). We review for clear error the trial court's decision regarding a child's best interests, *In re Sanborn*, 337 Mich App at 276, focusing on the child, not the parent, *In re Atchley*, 341 Mich App at 346.

To determine the best interests of a child in a termination proceeding, the trial court must weigh the available evidence and consider a wide variety of factors, including the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, the advantages of the foster home over the parent's home, the length of time the child was in care, the likelihood that the child could be returned to the parent's home in the foreseeable future, and the parent's compliance with the case service plan. See *In re Sanford*, 337 Mich App at 276-277. "[I]f the best interests of the individual children *significantly* differ, the trial court should address those differences when making its determination of the children's best interests." *In re White*, 303 Mich App 701, 715; 846 NW2d 61 (2014). The trial court does not err, however, merely by failing to explicitly make individual best-interests findings for each child. *Id*. at 716.

In this case, the trial court considered respondent's lack of parenting ability, as shown by the ongoing safety and health concerns, and respondent's lack of engagement in, and progress from, the services offered. The trial court also considered the children's need for stability and permanency, which their foster home provided, the children's bond with their foster parents, the foster parents' willingness to adopt both children, and that the children were doing well mentally, emotionally, and physically in the foster home. Our review of the record indicates that the trial court did not clearly err by finding that termination of respondent's parental rights was in the children's best interests.

Contrary to respondent's assertion, the trial court did not err by not considering the best interests of each child separately. There was no evidence that the interests of MF and DF significantly differed. See *id.* at 715. They are close in age and placed with the same foster parents. Neither child appeared to have a bond with respondent, and according to the foster parents both children "really struggled" after respondent's parenting time. Apart from MF's dental health, there were no characteristics or needs warranting separate consideration of each child. The trial court therefore did not err by considering the best interests of MF and DF together. See *id.* at 716.

We further disagree with respondent's contention that the trial court erred by not considering guardianship for the children. Guardianship is appropriate if the trial court finds that a child cannot safely be reunified with their parent, but that termination of parental rights is not in a child's best interests. *In re TK*, 306 Mich App at 707. Although a trial court may forego termination of parental rights and instead place a child in a guardianship, a trial court is not required to establish a guardianship in lieu of termination of parental rights if it is not in the child's best interests to do so. *In re Lombard*, ___ Mich App ___, ___; ___NW3d ___ (2024) (Docket No. 367714); slip op at 6.

Here, there were continuing concerns about medical neglect and inappropriate safety and supervision when the children were in respondent's care. Respondent argues that placing MF and DF into a guardianship would allow her more time to improve her parenting skills. The focus of the best-interests inquiry, however, is the child rather than the parent. Moreover, there was no clear timeline in this case regarding if or when respondent would improve sufficiently to care for her children. The trial court did not clearly err by concluding that termination of respondent's parental rights was in the best interests of the children.

Affirmed.

/s/ Michael F. Gadola
/s/ Randy J. Wallace
/s/ Matthew S. Ackerman